## DELANA A. WILSON *vs.* FRANZ M. SIMMONS.

### Knox.    Opinion May 23, 1896.

*Way.   Trees.   Rockland City Charter, R. S., c. 18, §§ 4, 14, 16, 65, 75.*

A report of the committee of the city council of Rockland in favor of laying out, altering and widening Main street in Rockland in 1889, having been legally accepted by the concurrent action of both boards of the City Council, *held;* that the approval on the part of the mayor in the acceptance of the report is not required; nor is the acceptance of it effected by the passage of any legislative "act, resolve or order" requiring the express approval of the mayor.

Such acceptance of the report of the committee operates as an adoption of their findings, and makes the adjudication of the committee the adjudication of the city council.

The city charter of Rockland requires the street committee of the city council to "make a written return of their proceedings . . . . containing the bounds and description of the way and the names of the owners of the land taken, when known, and the damages allowed therefor;" but, under the circumstances disclosed by the evidence in this case, *it was held,* that the omission of the committee to state the names of all the land-owners in their return must be held only as an irregularity in the manner of completing their action, and not a radical defect which renders the action itself a nullity as a defense to an action of trespass against the street commissioner for building a sidewalk within the limits of the way by order of the city council, and for cutting down and removing trees standing thereon.

A return, in the report of the committee, of the names of the land-owners and the damages awarded has not been considered by the courts of Maine and Massachusetts to be a matter of such vital importance as to amount to a prerequisite to the validity of the location of a way.

*Held;* in this case, that it appears that the plaintiff's right of appeal upon the question of damages was as fully preserved as if her name had been stated in the return of the committee.

A street commissioner is justified in removing trees standing within the limits of the street, if such removal is reasonably necessary to the proper construction of a sidewalk which he is directed by the city council to build; and even if it is not reasonably necessary to remove the trees, he would not be liable, if in removing them, he pursues his honest judgment, acting in good faith and without malicious or improper motives.

Nor would he be liable for removing the whole of a tree standing partly within and partly without the location, if reasonable necessity required it, and the removal of that part within the location would destroy the tree.

The principle of law which controls the liability of the owner of a private lot
for cutting a tree standing on the line between him and an adjoining pro-
prietor, is not applicable to a street commissioner who is required by reason-
able necessity to hew to the line in the construction of a sidewalk, and
invested with authority to remove any obstacle which obstructs, or is likely
to obstruct, a way or render its passage dangerous.

ON REPORT AND EXCEPTIONS BY PLAINTIFF.

This was an action of trespass q. c. against the street commis-
sioner of the city of Rockland for removing certain trees, digging
up the soil, and other trespasses in front of the plaintiff's house
on Main street, while constructing a sidewalk in the month of
October, 1894.

The defendant justified his act as road commissioner of Rockland,
alleging that the trees were within the located limits of the high-
way. The plaintiff's deed, dated in 1838, bounds her premises on
the street or road; and, although the road is an ancient highway,
no record of its laying out could be found prior to a record dated
in 1889, and called the road as laid out under Rose's survey.
There being no record or monuments to define or indicate the loca-
tion of the street, other than the buildings or fences along the side
thereof, the city in 1889, proceeded to locate and establish a street
or way there as required by law. By such location, as appeared,
some three or four feet in width of plaintiff's land, inside of the
fences, which had existed in front of the plaintiff's premises for
more than twenty years, were taken; but nothing had been done
by way of actually entering upon the land, from the time of the
location, until the defendant entered upon it in 1894.

The case was submitted to the jury upon the assumption that
such laying out, in 1889, was sufficient and legal as a proposition
of defense against the plaintiff's claim; and, upon that assumption,
a verdict was rendered for the defendant. It was admitted that, if
such laying out was not valid and sufficient as a defense to this
action, that there would be no defense against the action, inasmuch
as the trees, etc., removed would in such case be found to have
been situated outside of the limits of the road and inside of the
plaintiff's close, as held by her through her fences for more than
forty years of adverse possession.

It was agreed by the parties, at the suggestion of the court, that the jury should find what the damages of the plaintiff were, assuming that such laying out in 1889 was not sufficient and valid as a defense against the plaintiff's claim; and the jury found, specially, that such damages would be the sum of five hundred seventy-five dollars and eight cents.

And the case was reported to the full court for their opinion whether such laying out, in 1889, was or not a sufficient and legal proceeding, such as would be a defense to the action.

If the court should be of opinion that the proceedings in laying out the way, in 1889, were not sufficient and legal to constitute a new highway, then, by the agreement of parties, the verdict in favor of the defendant was to be set aside and a judgment entered against the defendant in favor of the plaintiff for the sum of five hundred and seventy-five dollars and eight cents ($575.08), as ascertained by the special finding. But if the court, on the contrary, found such proceedings were sufficient and legal, then the verdict in favor of the defendant was to stand, unless set aside and a new trial granted for some erroneous ruling of the justice presiding, stated in the exceptions taken by the plaintiff.

EXCEPTIONS. The plaintiff claimed the right to show, by evidence, that the removal of the trees was not necessary for the good of the public travel, and offered evidence intended to be bearing on that point, and whatever is contained in the following colloquy between counsel and court will exhibit such rulings and requests and refusals as were made on the subject.

Testimony of James Hull. "After leaving Holmes Street, on which side of Main Street is nearly all the residences and population?"

"On the eastern side."

"Is there, in fact, any population of any consequence on the western side?" [Objected to.]

Mr. Johnson: They set up that public necessity requires them to cut down these trees; now, we have a right to show that the public necessity depends upon the travel there.

The Court ·  I don't believe I shall submit to the jury whether the city is jus ified in taking land for public purposes.  If they have taken it, th y are to be the judges of that.

Mr. Mortland, referring to a decision in the 78th Maine in which, he said, the Chief Justice concurred, said:  " There is a question at issue as  o whether the surveyor had a right to determine, or whether it is a fact for the jury."

The Court :  A right to determine whether he is acting with bad motive.

Mr. Fogler :  The issue in that case is whether the acts were malicious.

Mr. Mortland :  But the Court lays down a rule—

The Court :  I think the city and its officers are the judges as to whether the public necessity requires it.

Mr. Mortland :  Then the public might be at the mercy of an incompetent man.  I will put this :  State as to what proportion of the population south of Holmes street travel on the western side ? [Objected to.]

The Court :  I think if he knows, if he has means of knowledge to give a good judgment, he may state what proportion of the travel goes on the west side of the street.

Mr. Fogler :  For what purpose ?

The Court :  As descriptive of the locus.

Counsel :  After you leave Holmes Street there is no sidewalk, and there is no travel down that way to speak of ; they have to cross over to go down on the eastern side.

In going from St. George, or South Thomaston or Owl's Head, on which side of the street would that population travel if they went on the sidewalk ?   [Objected to.]

The Court :  That is too remote—the city is just as much bound to give five of its population good travel as it is to give twenty-five of its population.

Mr. Mortland :  They say that whatever they did was necessary to be done.

The Court: I shall never submit to this jury the bare, single question as to whether there was any necessity of building the sidewalk or not.

Mr. Mortland: We contend that under the city charter, the city government has entire control over it. The surveyor has no authority except what is conferred by the city government.

The Court: Then he is a trespasser in everything he has done. I shall exclude that last question.

Mr. Johnson: Then as to the other point. The city has the right to build the sidewalk on the line of the street, but when it comes to taking down trees or anything that projects into the sidewalk, there must be a matter of necessity before a man can take them down; now can I show whether these trees should or not come down according to the necessity?

The Court: You will find that it has very little to do with it before we get through, according to my view of it. If a surveyor, every time he removes a tree or rock from the side of the road, has got to prove to a jury that it was necessary to do it, he does not occupy much of an office.

Mr. Johnson: The owner of the fee has a right to plant trees, and the statute is full of authority, and when he does plant them, the court says that the surveyor shall protect them until there is a necessity for taking them down. Now haven't we a right to show the amount of travel that goes up and down that street?

The Court: My idea is that the city is the judge of the necessity, and, in some degree, the officer who has charge of the road.

Mr. Johnson: Yes, and the citizen who goes up and down the street ought to know.

The Court: I have allowed you to put it in, in a general way, but I cannot give it the force as you now claim. It is too remote —to show the unreasonableness of it—to ask whether the travel from St. George or some other place named has to go one way or the other. I have allowed you to show the amount of travel going there, the general fact. Otherwise, you might go far enough to prove the names of the people and how often they go.

Also, in the testimony of Mrs. Emma Karcher, the daughter of the plaintiff, the witness was asked if she knew " any reason for cutting those trees down," which question was objected to and the court said: " She need not answer that question."

Also, in the testimony of Mr. Simmons, the defendant, is the following:

Defendant's Counsel: State whether you had any talk with Mr. Carleton after the trees were cut down, or with Dexter Simmons, relative to hiring some one to grade and sod the lot? [Objected to.]

The Court: Any directions that he gave are admissible.

Mr. Mortland: Directions to a party not in the presence of my client?

The Court: .Anything that he did showing good faith and reasonableness is admissible.

Mr. Mortland: I would like an exception to that.

The Court: You may have an exception, and he may state what he did or directed to be done.

Witness: "I told Mr. Dexter Simmons to engage Mr. Carleton to sod up the premises and move the shrubbery and put the bushes anywhere that Mrs. Wilson wanted them put; to consult her, and if she wanted them changed, to change them as she wanted them."

To which rulings and refusals to rule, the plaintiff excepted. Other exceptions relating to the charge are adverted to in the opinion.

The case appears in the opinion.

*D. N. Mortland* and *M. A. Johnson,* for plaintiff.

*C. E.* and *A. S. Littlefield,* and *W. R. Prescott,* for defendant.

SITTING: WALTON, FOSTER, HASKELL, WHITEHOUSE, WISWELL, STROUT, JJ.

WHITEHOUSE, J. This case comes to the law court on report and exceptions. It is an action of trespass quare clausum, brought against the road commissioner of Rockland, for damages alleged to have been sustained by the construction of a sidewalk within the

located limits of Main street in that city. The plaintiff contends that the location of the street relied upon by the defendant, was not a legal and valid one; and secondly, that in removing certain large trees in front of her house, the defendant acted wantonly, oppressively and maliciously, and thereby forfeited all claim to the justification which a legal location of the street might have afforded him. But, upon the hypothesis submitted in the instruction of the court, that there had been a valid location of the street in 1889, the jury rendered a general verdict in favor of the defendant. At the same time, by direction of the court, the jury also returned a special finding assessing the damages to which the plaintiff would be entitled, in the event that such location should be found invalid as a ground of defense to the action.

I. The question of the validity of the location of the street, thus raised by the report of the alternative findings of the jury, is now presented by the learned counsel for the plaintiff in an able and exhaustive argument upon two propositions. It is contended that the location is not valid, first, because the report of the committee of the city council of Rockland in favor of such "laying out, altering and widening" of Main Street in 1889, was not approved by the mayor, and not legally accepted by the city council, and because even a legal acceptance of the report would not in itself be sufficient to establish the way; and secondly, because the report does not state the names of the owners of the land taken and the damages allowed therefor.

It is provided in section two of the city charter of Rockland that "the administration of all the fiscal, prudential, and municipal affairs of said city with the government thereof shall be vested in one principal magistrate, to be styled the mayor, and one board of seven, to be denominated the board of aldermen, and one board of twenty-one, to be denominated the board of common council; which boards shall constitute and be called the city council." Section three provides that the mayor "shall from time to time communicate to the city council such information and recommend such measures as the interests of the city may require," and "shall

preside in the board of aldermen and in the joint meeting of the two boards, but shall have only a casting vote." Section four declares that "every law, act, ordinance, resolve or order, requiring the consent of both branches of the city council, . . . . shall be presented to the mayor for approval." But if not approved by him, it shall be returned with his objections at the next session of the city council, and if then passed by a two-thirds vote, it shall have the same effect as if signed by the mayor; and if not so returned "the same shall be valid without approval."

Section nineteen contains the following provisions in regard to the location of streets and public ways: "The city council shall have exclusive authority to lay out, widen, or otherwise alter or discontinue any and all streets or public ways in the city of Rockland without petition therefor, and to estimate all damages sustained by the owners of land taken for that purpose. A joint standing committee of the two boards shall be appointed whose duty it shall be to lay out, alter, widen or discontinue any street or way in said city, first giving notice of the time and place of their proceedings to all parties interested by publishing the same two weeks successively in two weekly papers printed in Rockland, the last publication to be one week at least previous to the time appointed. The committee shall first hear all parties interested and then determine and adjudge whether the public convenience requires such street or way to be laid out, altered or discontinued, and shall make a written return of their proceedings, signed by a majority of them, containing the bounds and descriptions of the street or way, if laid out or altered and the names of the owners of the land taken, when known, and the damages allowed therefor ; the return shall be filed in the city clerk's office at least seven days previous to its acceptance by the city council. The street or way shall not be altered or established until the report is accepted by the city council, and the report shall not be altered or amended before its acceptance." This section also contains an express provision that any person aggrieved by the judgment of the city council may appeal to the supreme court upon the question of damages.

An inspection of these provisions, thus quoted at length from the city charter, in connection with the records of the city council, will render any extended discussion of the plaintiff's first contention unnecessary. July 1, 1889, an order was passed by the city council instructing the joint standing committee on new streets to "lay out, alter and widen" Main Street, if they adjudged that public convenience required it, in accordance with certain definite bounds, courses, distances and width specified in the order. This order was duly approved by the mayor. After due notice and hearing given to all parties interested, this committee adjudged that the street should be altered and widened as specified, and made a written return of their proceedings containing a definite description of the bounds, courses, distances and admeasurements of the street as altered and widened by them ; and this description is identical with that contained in the order above mentioned passed by the city council and approved by the mayor. This return appears to have been placed on file in the city clerk's office September 28, 1889, and on the 7th of October following, it was received in the board of aldermen, "accepted and sent down for concurrence." November 4, 1889, the report was "accepted in concurrence" by the common council. Being thus duly accepted by the two branches, which constituted the council, the report was legally accepted by the city council. The acceptance of this report was not accomplished by the passage of any legislative "act, resolve or order" requiring the express approval of the mayor. *Preble* v. *Portland*, 45 Maine, 241.

Nor, is it necessary that there should be concurrent action on the part of the mayor in the acceptance of the report. "He is so far a part of the city government that no legislative act can be passed by the other branches without his approval, unless by vote of two-thirds of the members in each of such other branches of the government. It is in this sense, and to the extent of such powers as are specially committed to him, and no further, that he is a part of the city council." *Brown* v. *Foster*, 88 Maine, 49.

The language of the charter above quoted, that the "street shall not be established until the report is accepted by the city council,"

is a clear implication that after such acceptance of the report by the city council, no further action on their part was contemplated as essential to the final establishment of the way. The charter makes it the duty of this joint standing committee to "lay out, alter, widen or discontinue any street or way." In this instance the city council specified in their order the exact bounds and admeasurements of the alterations desired, and instructed the committee to determine the question of public convenience. The acceptance of the report of the committee clearly operated as an adoption of their findings, and made the adjudication of the committee the adjudication of the council. *Cassidy* v. *Bangor*, 61 Maine, 434; *Dorman* v. *Lewiston*, 81 Maine, 411; *Preble* v. *Portland*, supra. See also Chap. 18, R. S., §§ 14 and 16.

The solution of the question involved in the second objection, that the report of the committee does not contain the names of all the owners of the land taken, though apparently attended with some difficulty, may be safely reached through familiar principles. The charter requires the committee to "make a written return of their proceedings . . . . containing the bounds and description of the way, if laid out or altered, and the names of the owners of the land taken, when known, and the damages allowed therefor."

With respect to the discharge of this duty, the report of the committee is as follows: "By the location and laying out aforesaid, land has been taken owned by Lucy C. Farnsworth of said Rockland, being a strip of land about 16 inches wide on the front of her lot, on the western side of Main Street, and we have estimated and allowed, as the damage sustained by said Lucy C. Farnsworth, by said taking, the sum of four hundred dollars, and we find that no other person or persons have sustained any damages by reason of the location and laying out of said Main Street as aforesaid, and the taking of any land thereby."

No requirement that the return should state the names of the owners of the land taken is found in any other of the fourteen city charters granted by the State between the year 1832, when Portland was incorporated as a city, and the year 1891; nor has any such provision ever been embodied in the general laws of the State

respecting the returns required of the county commissioners or the municipal officers of towns. With respect to the former, the requirement of the statute is that they shall "make a correct return of their doings . . . accompanied by an accurate plan of the way, and state in their return when it is to be done, the names of persons to whom damages are allowed, the amount allowed to each, and when to be paid." R. S., Ch. 18, § 4. With regard to the latter, the language of the statute is that: "A written return of their proceedings containing the bounds and admeasurements of the way and the damages allowed to each person for land taken, shall be made and filed with the town clerk." All the other city charters within the period named, appear to have been modeled substantially after the Portland charter, which in this respect makes the city council subject to "the same rules and regulations as are provided in the laws of the state regulating the laying out and repairing of streets and public ways."

In *Vassalborough, Pet'rs for Certiorari*, 19 Maine, 338, the requisites of a proper return under the statute then in force were brought under discussion, and it was held that while it might be desirable that the names of all persons over whose land the road located passes, should appear in the return of the commissioners, it was not indispensably necessary; that it was "not every irregularity, or even illegality, which may have arisen in such a matter, that imperatively urges the discretion of a court to grant a certiorari;" and that the weight of authority was against any interference in that case.

In *Howland* v. *County Commissioners*, 49 Maine, 143, the construction of the statute was again brought in question, and the court said in an opinion by Mr. Justice CUTTING: "This statute does not require the commissioners to ascertain and determine the legal title, description, location or boundaries of each proprietor's lot over which the highway passes when no one appears to claim damages between the times of the notice first given and the close of the original petition,—notices sufficiently given both by publications and a public record, and a time sufficiently long to enable any person injured to present his claim for damages and to estab-

lish his title. The commissioners, when none such appears, may well conclude that none such exists, and that no adjudication is necessary. . . . . . . The argument of counsel that, under such circumstances, the constitutional rights of the citizen have been invaded, is untenable."

In *North Reading* v. *Co. Com'rs*, 7 Gray, 109, the same conclusion was reached. "Some of the earlier cases," said the court "seem to require that the persons, over whose land the proposed way passes, should be named. It is, however, rather directory. . . . Practically, it seems of little consequence whether the names, and the rejection of the claim for damages, appear by the direct language of the return of the assessment of damages, or are inferred from the fact that no damages were awarded. If the location of the way is distinctly defined in the report of the location, and thus notice given to the landholder that his land is taken, and by the further report of damages he finds none awarded him, it is virtually a refusal to allow him damages, and would authorize an application for a jury to assess damages, as much as if his name had appeared in the report as one to whom no damages were allowed. It is certainly the more regular mode to name, in the assessment of damages, all the persons over whose land the way passes, and to state those, if any, to whom no damages are awarded. If the omission to do so would bar the landholder from asking for a jury to assess his damages, we might be holden to grant a writ of certiorari, however fatal the consequences might be—as they certainly would if the proceedings were illegal—in rendering nugatory the whole location and establishment of the way." But holding that the rights of the land-owner might be equally secured without a statement of all the names, the petition was denied. These views were adopted by our court in *Howland* v. *Com'rs*, supra. See also *Monagle* v. *Co. Com'rs*, 8 Cush. 360.

It is contended by the defendant, in limine, that in the light of the rule of procedure thus established by legislative and judicial action in this state and Massachusetts, and of the excellent reasons given in support of it, the provisions of the charter in question ought not to receive such a literal construction as to require a

statement of the names of the land-owners when no damages are allowed. But, assuming that it was designed to inaugurate a departure from the practice which had uniformly prevailed under other charters, as well as under the general laws of the state, the defendant still insists that a literal observance of the requirement is not indispensable to the protection of the rights of the land-owner, and that failure to comply with it ought not to be attended by the fatal consequences claimed by the plaintiff.

It is undoubtedly true that, in the exercise of the power of eminent domain delegated to them by the legislature, municipal corporations should be held not only to a strict compliance with all prerequisite conditions and limitations for its exercise, but also to an observance of all substantial provisions respecting the mode of procedure which were prescribed and intended for the protection of the citizens and to prevent a sacrifice of his property. If there be an omission of any of the essential jurisdictional requisites, the proceedings will be void. If, however, the defect is not so radical as to deprive the council of jurisdiction, but is only a deviation from certain minor provisions, designed to secure method and convenience in the procedure, it may properly be termed an irregularity only; and if the rights of the land-owner would not be injuriously affected thereby, it will not vitiate the proceedings. Dillon Mun. Corp. §§ 604, 605; Black on Int. of Law, 340, and cases cited. The distinction is expressively stated by Chief Justice PETERS in *Bank* v. *Rich*, 81 Maine, 164: "Generally speaking, it is the difference between substance and form, between void and voidable, or between void action and imperfect action. Error or nullity goes to the foundations, and discovers that the proceedings have nothing to stand upon, while irregularity denotes that the court was acting within its jurisdiction, but failed to consummate its work in all respects according to the required forms. The one applies to matters which are contrary to law, the other to matters which are contrary to the practice authorized by the law. One relates more to the act, the other to the manner of it. It may be stated as a general rule, that in doubtful cases the courts incline to treat defects in legal proceedings as irregularities rather than as

nullities." It may be added that, in the class of cases to which the one at bar belongs, if the defect is not plainly jurisdictional but relates to form rather than substance, the question whether it shall be deemed an irregularity or render action a nullity, must be determined mainly by considerations of justice towards the parties to be affected. If it is apparent that no injustice would be occasioned to land-owners by sustaining the proceedings, on the one hand; and, on the other, that great injustice and consequences mischievous and far-reaching would inevitably result from a nullification of the action, the defect may well be treated as an irregularity only.

It is not in controversy in the case at bar that all other requirements of the charter, except that relating to the names of the land-owners (and the formality of accepting the report already considered) were strictly and fully observed by the committee and the council in "laying out, altering and widening" the way in question. Indeed, extraordinary measures, not required by the charter, appear to have been taken to give the abutting owners full information of the precise nature and extent of the alterations contemplated. For while the charter only requires the committee to give "notice of the time and place" of their proceedings to all parties interested, by publishing the same two weeks successively in two weekly papers, etc., it has been seen that the notice actually published by the committee embraced a complete and accurate description of the alteration proposed, with a definite statement of the bounds, courses, distances and width, "all according to a survey of E. Rose & Son as shown in city atlas;" being the identical description, bounds and admeasurements contained in the original order passed by the city council July 1. This notice thus comprising an exact survey of the new lines proposed, was published, not only in two, but in three weekly papers printed in Rockland. A full hearing was given to all parties interested, appearing at the time and place fixed therefor, on the 16th day of August. The return of the committee, adjudging that the alteration proposed was required by public convenience, was signed and filed in the office of the city clerk more than seven days prior to its acceptance by

the city council. This return contains the identical description and survey comprised in the original order and in the notice published in the three weekly papers. It states that the committee award damages to Mrs. Farnsworth in the sum of $400 and "find that no other person or persons have sustained any damages by reason of the location and laying out of said Main Street and the taking of any land thereby." It does not specify the name of any other abutting owner whose land was taken. The new location extended a distance of nearly three-fourths of a mile. It was obviously impracticable for the committee to make a correct determination of the question of adverse possession and of the legal and equitable title in respect to every proprietor's lot; and, to state that the owners were unknown would serve no useful purpose. But a substantial equivalent for such information as they could be expected to give, concerning the ownership of the lots, is afforded by the accurate description and survey, with a reference to the city atlas, published in the weekly papers. Thus every abutting owner was put upon inquiry, and enabled to ascertain if any of his land would be taken, without even visiting the office of the city clerk; while if there had been a literal compliance with the several provisions of the charter and the names of all owners had been stated in the return filed in the clerk's office, but the "notice of the time and place of the proceedings" published by the committee had not embraced a description of the new location with bounds and admeasurements, every land-owner would have been compelled to repair to the clerk's office in. order to examine the return and ascertain if it disclosed his name as one whose land had been encroached upon by the new line. Nor would the mere discovery of his name there conclusively show that his land had been taken, for the true boundary line of his lot would not be settled by the report of the committee.

More than four months elapsed after the passage of the original order, and nearly three months after the last publication of the notice, before the proceedings were closed and the new location established. The plaintiff's right to an appeal upon the question of damages was as fully preserved as if her name had been men-

tioned in the return; but for five years she acquiesced in the action of the city council and only "awoke from a long sleep" when measures were taken to make the new location practically available in the construction of the sidewalk in question.

Under these circumstances, the omission to state the plaintiff's name in the return cannot be held a defect respecting any jurisdictional requisite. It was a direction relating to the manner of consummating the work, but not a matter which can be deemed of the essence of the thing to be done. In all the general legislation upon the subject in this state and Massachusetts, from their early history to the present time, it has never been deemed essential to the protection of the rights of the citizen to make such a requirement. For more than half a century it has been uniformly considered by the courts in both jurisdictions, that it was not a matter of such vital importance to the land-owner as to be held a prerequisite to the validity of a location. The rule which appeared to be laid down in the early cases of *Com.* v. *Coombs*, 2 Mass. 489, and *Com.* v. *Great Barrington*, 6 Mass. 492, was declared to be directory merely, as already noted, in the later cases *Monagle* v. *Co. Com.*, 8 Cush. 360, and *North Reading* v. *Co. Com.*, 7 Gray, 109. The rule may be none the less directory when provided by the legislature than when enunciated by the court.

In view of the abundant opportunity afforded the plaintiff to learn if any part of her lot would fall within the line of the new location, it could not reasonably be anticipated that her rights would be injuriously affected in any respect by the failure of the committee to make express mention of her name in their return. On the other hand, the consequences of declaring the entire location void after the lapse of seven years, and after the grades and bounds of numerous abutting lots have been modified to conform to the new line of the street, would involve great inconvenience to the public, and damage and injustice to innocent persons. It is, therefore, the opinion of the court that, under the peculiar facts of this case, the omission of the committee to state the names of all the land-owners in their return should be held only an irregularity in the manner of completing their action, and not a radical defect

which renders the action itself a nullity as a defense to this proceeding.

II.    Numerous exceptions were also filed by the plaintiff to rulings, instructions and refusals to instruct, on the part of the presiding justice.

It appears from the record that the plaintiff's counsel took exceptions generally to instructions given to the jury, comprising nearly eight closely printed pages and fully one-half of the entire volume of the charge, and containing, at least, six distinct legal propositions, without even distinguishing by brackets, or italics, the paragraph to which the exceptions were designed to apply, or in any manner designating the proposition to which objections were specifically to be made.

This method of taking exceptions to the charge in gross is such a palpable disregard of the eighteenth rule of court as expounded in *McKown* v. *Powers*, 86 Maine, 291, and has been so often declared to be ineffectual for the purpose of reserving legal questions for the court, that the counsel for the defendant insists that it is now the plain duty of the court to refuse to give these exceptions any consideration whatever.    True, the exceptions were allowed by the presiding justice; and the contentions of the plaintiff are so clearly and vigorously stated in the argument of her counsel that the court is not left in doubt as to the particular instruction claimed to be erroneous; but the objection is not thereby obviated, as the counsel for the defendant was not thus aided in the preparation of his argument.    An imperative rule has been established and repeatedly reaffirmed in order to secure greater regularity and certainty in the administration of justice, and no material relaxation of the rule will be countenanced, unless for special and peculiar reasons in the furtherance of justice.    The instructions to which these exceptions appear to relate will, therefore, only be examined for the purpose of giving more intelligent consideration to other exceptions which appear to have been regularly taken and properly presented.

It is provided by section one of chap. XIII of the city ordinance

that it shall be the duty of the road commissioner "under the direction and subject to the approval of the city council, or such committee as they may appoint, to superintend the state of the streets, sidewalks . . . . and attend ,to the building, widening, altering or repairing of the same. It is also provided by section three that it shall be the duty of the road commissioner to see that no encroachments are made upon any street, etc., by fences, buildings or otherwise. Section four declares that: "All powers vested in, and the duties required of, highway surveyors by the laws of this state are hereby vested in and required of said commissioners." See also Rev. Stat., Chap. 18, § 75.

It appears in this case that, after the report of the committee establishing the new location, in 1889, had been filed in the city clerk's office, the street commissioner was instructed by the city council "to build a four and one-half foot cross-plank sidewalk" between specified limits on this street passing the plaintiff's premises, and that in the execution of the authority thus conferred upon him, the alleged trespasses were committed by him. Upon the hypothesis that this location of 1889 was a valid one, the presiding justice instructed the jury as follows:

"In obeying that direction, he was not a trespasser in going upon any part of the limits of the street which were conferred upon the city by the laying out of 1889. He had a right to be there. He had a right to construct the walk, he had a right to be anywhere within the limits of the highway as then laid out; and it is not doubted in this case that the limit, the western limit of the road, opposite these premises, pushed the line of the road as traveled and occupied up, upon the former premises of the plaintiff several feet—I think it was stated here, perhaps two and one-half feet. He was not a trespasser in my judgment of the law, although the committee under whose supervision he was to construct the way did not participate in the construction, and were not present aiding and assisting him, either in their judgment or otherwise, because there is nothing in evidence indicating that he was building this road in opposition to any instruction, or regulation, or direction on their part. There, then, we find him, rightfully on these premises

to build a sidewalk. He had a right, so far as this plaintiff is concerned, to build it up to the very limits of the road although it was beyond some of these trees, although it was beyond all the trees, any or all. It was testified to that the policy of the city had been, in making new constructions of sidewalks, to build on the line for the public welfare ; for the public good ; for the improvement of the city ; for the benefit of its citizens ; and, in this aspect of the case, he had a right, under that direction, not being interfered with, not being directed to the contrary, to build a sidewalk at this spot upon the very line between the plaintiff and the city as indicated by the survey or laying out of 1889. But the precise question here is whether in laying out a sidewalk, which he was legally justified in making, he was or not also justified in removing the trees. Should he have built a sidewalk in such a manner, in such a mode of construction, with such variations in it, as to allow the trees to stand or not? As he was not directed by the city council to remove the trees, he removed them, somewhat, at least, upon his own responsibility. . . . . . And hence arises the first question in the case, whether it was reasonably necessary to remove these trees, or any of them, in order to effect the construction proposed by the city and by the defendant, or not. . . . . . The plaintiff contends that it was utterly unnecessary, unreasonable ; the defense contends that it was necessary, that it was reasonable, because, says the defense, he could not build up to where he had a right to build without making the removal. The idea is, as elaborated by counsel in commenting on the evidence, that he could not have moved in the sidewalk two and one-half feet without digging down for the purpose of doing it, and thus undermining the roots of the trees and leaving them in such condition as would obstruct the sidewalk and the passage there, and prevent improvement, prevent the widening of the street, prevent a smooth grade of the sidewalk and prevent the general purpose designed by the city in making its improvements. The plaintiff contends that it could have been avoided, it could have been reasonably avoided, and the defense contends that it could not. If you find, looking fairly without any feeling of prejudice, just at the true facts and

the law,—if you find that the removal of the trees, or even a partial removal of them, so far as that goes, was reasonably necessary to make the necessary improvements intended,—if you find it to have been reasonably necessary,—that is a perfect defense for the defendant; but if you do not find—or if you do find, on the contrary, that it was unnecessary and unreasonable to remove the trees, then the defendant is not liable, unless you further find that he was actuated in doing so by some improper or dishonest motive. If he acted honestly, without being actuated by any improper or dishonest motive, in good faith, and removed the trees because in his judgment it was reasonable and necessary to remove them in order to make and complete the improvements he was making, then he is not liable in this action for his act; but if, in pursuing his own judgment, he was actuated by improper and dishonest motives, and you further find that it was an unnecessary and an unreasonable act, then he would be liable for all he has done and its consequences. But, the law will protect him as a public officer in this emergency, if he pursued his own judgment acting honestly, although he may have acted fearlessly and although he may have committed a mistake. Such in my judgment is the law."

These instructions are in harmony with the decision, as well as the language of the opinion, in *Wellman* v. *Dickey*, 78 Maine, 31, and with the implication in *Hovey* v. *Mayo*, 43 Maine, 322. They are consonant with reason and justice and afford the plaintiff no ground for exceptions. They are much more favorable to her contention than the doctrine uniformly laid down on this subject by the court in Massachusetts. See *Denniston* v. *Clark*, 125 Mass. 219; *Morrison* v. *Howe*, 120 Mass. 565; *Brick Co.* v. *Foster*, 115 Mass. 431; *Benjamin* v. *Wheeler*, 15 Gray, 486; *Same* v. *Same*, 8 Gray, 409.

With respect to the liability of the defendant for cutting a tree that stood upon the line, partly within and partly without the limits of the location, the instruction was as follows: "Now if the defendant is not guilty of wrong, under the rules which I have given you, in removing the trees, he would not be guilty in removing so much as was within the limits of the road even if he

removed the whole tree, if necessary to do it. In other words, if removing just so much as was in the city limits would destroy the tree, you will judge whether there was any injury in taking the remainder of the tree. Apply your common knowledge and common sense to that condition of things."

It is obvious that the principle of law, which would control the liability of the owner of a private lot for cutting a tree standing on the line between him and an adjoining proprietor, would not be applicable to a street commissioner who is required by a reasonable necessity to hew to the line in the construction of a sidewalk and invested with authority "to remove any obstacle, which obstructs or is likely to obstruct a way, or render its passage dangerous." R. S., Ch. 18, § 65. If three inches of a large tree extended outside of the limits of the street, and all of it within the location were removed, it is plain that the liability that the tree would fall across the street would be a constant menace to public travel; and it would be wholly impracticable to distinguish such a case from the situation where one-half, or a different proportion of the tree, might be outside of the location. If the jury were justified in finding that the defendant acted from a reasonable necessity and from proper motives in removing the trees, it would seem from the general verdict returned for the defendant that they also obeyed the instruction given to them to "apply their common knowledge and common sense" to the condition of things when a tree was partly outside of the limits of the street. It is the opinion of the court that the defendant was not necessarily liable in trespass for cutting the whole of a tree under such circumstances, if reasonable necessity required it; and that the instructions upon this point were appropriate and adequate.

It is provided in the charter that the "city shall not be compelled to construct or open any street or way thus hereafter established until, in the opinion of the city council, the public good requires it to be done, nor shall the city interfere with the possession of the land so taken by removing therefrom materials or otherwise, until they decide to open and construct said street;" and the plaintiff's counsel requested an instruction in this case that the

street commissioner was not authorized to interfere with land taken in widening this street until they had decided to open and construct it.   The presiding judge refused to give this instruction and ruled against it, and the plaintiff has exceptions to this ruling. The instruction upon this point was undoubtedly correct.   The provision in the charter above quoted clearly relates to the opening of a new street, and not the widening of a street already opened and occupied.

The decision of this court in the analagous case of *Heald* v. *Moore*, 79 Maine, 271, is a practical determination of this question against the plaintiff.

The propositions embraced in the other requested instructions were fully covered by the charge.

In the early part of the trial a colloquy occurred, between the counsel for the plaintiff and the court, respecting the admissibility of certain evidence claimed to be material upon the question of the reasonable necessity for the removal of the trees; but it is not shown that any exceptions were taken to the exclusion of evidence upon this point, or that any material evidence was in fact excluded. An exception was seasonably taken and allowed to the admission of testimony from the defendant in regard to the directions given by him to have the plaintiff's premises sodded and the shrubbery removed as she might prefer.   This fact was manifestly relevant to the issue respecting the reasonableness and good faith of the defendant's conduct.

The entire charge is made a part of the case, and after a careful examination and study of all the legal propositions there considered by the presiding justice, we find no reason to question the fullness or correctness of the instructions with which the vital issues involved in the case were submitted to the jury.   The conclusion, therefore, is that the entry should be,

*Exceptions overruled.*
*Judgment on the verdict for the defendant.*